Samsung Electronics Co., Ltd. Judge Bea, can you hear us? I'm here. Great, okay. Sorry for the delay, but Mr. Kluwer can continue finally. Okay, thank you. Judge Bea, can you hear? Yes, I can hear you, but I can't hear Judge Gould very well. Okay. Let me bring the mic closer. Drive me closer. Okay, Judge Bea. I can hear you fine now. Okay. Okay, if I may resume, I believe we were talking about harm. In Rodriguez, this court upheld a complete forfeiture despite the absence of any harm, and Judge Bea's opinion in Berthelsen is also a no-harm, no-foul case, and in that case, there really was no argument that there was any prejudice, and we believe that difference in interest is a concrete harm and that when the new fee was awarded, it didn't reinstate the old fee retroactively in such a way that would have entitled them to the interest that would have accrued. It's our position that upon the vacature, only then would Hugginsburg be entitled to interest on the fee. But even if this court concludes that there is no harm to the class, in Berthelsen, this court only affirmed because the district court provided multiple sound reasons for denying the forfeiture. It went through the relevant considerations for forfeiture and only then arrived at the conclusion that it was unnecessary. In this case, we were provided nothing. There was no analysis. We submitted our arguments as to why this is an egregious violation, the severity of the violation, the timing of the violation, and the fees, and the district court essentially said we did not show our entitlement to forfeiture, and it's our belief that's not enough, especially considering the egregiousness of what we see as violations. Counselor, are you arguing that the district court was required to decide whether there was an ethical violation? Yes, we do. That's our position, that is, especially in the context of a class action setting. But it was error for him to not decide it, is that right? Yes. All right. Honor Rodriguez. We recognize that we're asking, it's a tall order to ask for forfeiture for a case in which class counsel achieved $205 million in settlements, but it's our belief that... Where there was no liability. Right, ultimately there was no liability. But, and as in the footnote in Rodriguez, look, results do not justify violations of the rules of ethics. And so we believe a strong penalty would be proportionate to the severity of the violations in this case. They kept client property for more than a year, disregarded the safekeeping rules, and have exhibited and demonstrated a lack of candor as recognized by the district court throughout the process. As it stands, they recovered nearly their complete lodestar without so much as a slap on the wrist. And so we've asked for the court to exercise its supervisory powers, and of course, in any alternative we would be fine with a remand. But I think this case is appropriate for that sort of relief because it does affect the administration of justice. If there is a perception that class action attorneys, there's an exception to the safekeeping rules, that class action attorneys can bypass the safekeeping rules. It presents opportunity and almost an invitation for abuse. And it would also serve the interest of judicial economy by avoiding any potential subsequent appeal. And there's a complete record before the court on the issue of forfeiture and on the violations. And then I guess I'll reserve my time. Counsel, what's your best case, federal published case, that would uphold a forfeiture of fees in this magnitude because of an ethical violation? So I don't think that probably the Rodriguez case, which involved $49 million in settlements, and there was a complete forfeiture there. So part of the problem there is that no attorneys have ever been, as far as we could find in the research, no attorneys have ever been accused of wrongfully withholding $52 million in attorney's fees that had been vacated with really no justification. So I don't have a case on point because, as far as I can tell, it hasn't happened before. I'll reserve my remaining time unless your honors have any more questions. Thank you. Good afternoon, your honors. I'm Shanna Scarlett. I represent the plaintiff appellee and direct purchaser class. I'm a partner at the law firm of Hawkins Fairman, who were class counsel in this case. Thank you for letting me appear by video today, despite the difficulties earlier. To allow the forfeiture of fees in this case, Objector Irwin asks that the court would require three things from the court. For this court to overlook waiver, the fact that these quick pay provisions in the settlement agreements were apparent when the court gave final approval, the district court in 2016, 2017, again in 2018. Other objectors objected to these provisions, and Mr. Irwin did not. It would require this court to overturn decades of case law, allowing quick pay provisions in the class action context, and which provides district courts great discretion in terms of the amount of attorney's fees, but also the timing of the payment of these fees. And it would require this court to disturb the discretion of Judge Seaborg in finding, after overseeing this MDL for 10 years, and observing the conduct of all of the parties for 10 years, that Hawkins Fairman had complied with the terms of the settlement agreement and complied with the repayment of fees as ordered by the court, which required the entire amount plus interest, as your honors have noticed. Even if this court found all of this, Objector Irwin asked this court to broadly apply the rules of professional conduct to class actions in a way that's contrary to other case law, and contrary to the language of the rules itself. As this court's already noted, there's no prejudice. The money was returned promptly. There was interest paid. Hawkins Fairman has complied with every order of the court, and still today continues to litigate on behalf of the class, overseeing distribution of the $205 million. And at this point without compensation, obviously our lodestar at the time we submitted it was $30 million, but we continue to respond to class members on a weekly basis. We are working with the vendors to make sure that money is given back to the class members from the 205 that was recovered from the defendants. And all of this is uncompensated. Irwin also argues that the award given to Hawkins Fairman was in excess. Of course, this court's jurisprudence is clear on one thing, and that is that in awarding fees to class counsel, the district courts must take into account all of the circumstances of the case. And Judge Seaborg did that here. What he awarded in the end is $31 million in attorney's fees, which is only 14% of the 205 million that was recovered on behalf of the  He also awarded a fee of $30 million, which was roughly equivalent to the lodestar of 30 million at the time of the fee submission. He was well within his discretion as the judge overseeing a very complex and lengthy MDL. Counsel. If I can interject. You will agree. In our prior decision. We said the starting point should be the schedule. It was submitted in a sealed bid. And that starting point was a sliding scale. Which allowed the first $5 million to be recovered without anything. Being charged. And my calculation is. That if the starting point were used and allowing for the. Sliding scale to be used. When you grant the discretion for judge Seabird. To up the fee by 20% because of the length of the. The proceedings. One comes to a figure of. I think it's. $26 million. $31 million. It's a, it's a 26 million, 646. With a difference of 4 million, $380,000. Because. But Seabird did not. Start. On the sliding scale. That was in writing and was the bid. Vacate that $31 million and remanded. And have good Seabird. Do the correct computation. With the sliding scale rather than allow it to remain. Your honor. Thank you for asking that question. So the bid that was submitted. Was intended as chief judge Seaboard. Interpreted it. Which is based on flat rates. And so it's an excerpt of records three 41. And in the precursor sentence, it says. Based on recovery from each defendant at various stages of the case. And so the intention of the bid. Was as judge Seabird interpreted, which is safe. For example, we had settled with. To Sheba. For $2 million. We would not have recovered any fees on that amount. But to the extent there was recovery of 25 million. Then the fee award would have gone into a different category. So, and it depended on the stage of the case. Judge Seaboard heard the objections from class members. The argument that it should have been based on marginal rates and not flat rates. However, he found that there was no evidence in the record to contradict. That flat rates were what was intended. And that has how he reached the fee award that he gave. And his starting place. Well, you will agree with me that. The evidence in the record is a schedule, which is a sliding scale schedule. Correct. That is correct. That's what's in writing. And I think you might agree with me. That the interpretation of written instruments. Is a legal question. Which the judge. Should interpret by himself. And which is reviewed. By for abuse of discretion. Correct. Your honor. I would only push back. I think your honor that it's. It was within the it's a within the abuse of discretion standard. Given that judge Seaborg had overseen this MDL for set the length. The period of time. He was aware of the prior holdings of judge Walker. In the Northern district of California. And he held that there was no indication. That judge Walker applied the marginal structure in this case. Or the, the appointed Huggins Furman with the understanding. It was a marginal rate structure. Regardless how judge Walker did it in other cases. The question I have in mind is this. We have a written instrument, which is. Interpreted by judges as a legal question. And that is the expressed intent of the parties. Why isn't judge Seaborg wrong? In using a. Flat basis, rather than the sliding scale basis. Based on the. The schedule we have before us. Your honor. I agree that the free proposal. ER 3 41 is one piece of it. But judge Seaborg also went further. And make certain findings of facts. Regarding whether or not we Huggins Furman had made an adequate showing. That we intended to use the flat rate structure. So, well, I understand your honors. Question. That this is. You're talking about extrinsic evidence. That it was used by judge Seaborg. To interpret the writing, which we have before us. And. What factual evidence was there? Well, first of all, are you saying that the. The written document is ambiguous and requires. Factual findings interpreted. No, your honor. It's our position that it is clear, especially given the lead in sentence. Saying that it was proposed based on recovery. From each defendant at various stages of the case. So we believe it's clear on its face. But in addition to that. Judge Seaborg did go further. And make the findings that we had made an adequate showing. We intended it to be a flat rate structure. Council. I'd like to interject. My question, if I could, please. My understanding is that. Per our prior. Panel opinion. Which. Vacated the. 52. $8 million fee award. And said that. A starting place. Should have been hemmed in. By the. Bid amount. The district court. Took that bid amount. And then upgraded it. Or enhanced it by. 20%. Is that right? That is correct, your honor. So what my question is. I wanted to know what were the. Factors. That. They were considered. In making a 20%. Increase in the bid amount. And I think what much money also. Of the 30. 32.8. Never has 31 million. Of the 31 million. Total new award. How much of that is. Based on. The 20% increase. Your honor. Judge Seaborg held. That well. Certain events were in general. Contemplated at the time of the bid in 2010. That that had not. Sufficiently. I counted for the level and the length of this litigation. It was one of the most contentious pieces of litigation. I think that he'd seen in his years on the bench. And certainly one of the most contentious that I've participated in. In the past. Some of the factors that gave him the comfort of giving the 20%. Award above. What was contemplated in the fee proposal. Included. That the enhanced award was close to the $30 million road star. The lack of any multiplier to class council so that there was no windfall. The fact that summary judgment had been entered against the class. And so the claims were found to have. A $0 legal basis. And then he looked at the work that was unforeseen in 2010. At the time of the leadership proposal. That included an enormous amount of pass-through evidence. That had not previously been undertaken. In this type of indirect purchaser case. There were a hundred subpoenas sent out to participants in the distribution channel. Which is two times more than any prior case. There were 194 million pass-through estimates in the expert reports. Again, far in excess of any case previously and not possibly contemplated. In 2010. Daubert challenges. Had not been contemplated in 2010. It wasn't until the Supreme court's opinion in 2011 in Dukes. That it was clear to class council. Pretty much all over the country. That Daubert would be now applied at class certification. And be an extra set of motions that would be brought in addition and counter to the class certification motions. There were also further factual. Developments regarding hedonic regressions, which was a very unique piece of evidence that was used in this litigation to show that pass-through existed at initial price points. There was a motion to compel. That was brought against Toshiba. One of the U S based OEMs and a huge amount of data was turned over after the first denial. The motion for classification. Again, none of this type of work. Could possibly have been contemplated back in 2010. It wasn't even contemplated at the time of the first. Classification motion. Or we clearly would have included it on the first round. And second, there was a co-integration analysis done by the experts that utilize the entire defendant data set. Something that hadn't been done previously in litigation. And I'm not aware it's been done since, again, This was only brought with the second class certification motion. Clearly not contemplated at the time of leadership. And not even contemplated at the time of the purpose. Classification motion, because obviously we didn't bring it then. The council. Thank you. But. Again, I want to know. Of that 31 million. How many million. Is. Of that. Represent the 20% increase. Your honor, if I'm doing my math, right. It would be roughly 6 million. It would be. I think. The award under the feed grid would be. I just trying to find my notes would have been 25.9 million. Essentially. So. It would have been the 2 million over. I mean, sorry. Terrible doing it map on my feet, roughly 5 million. I want to say, but again, I'm rounding up. But those numbers would be in the record. Okay. Thank you. Just briefly touching again on a little bit of other. Evidence that wasn't the record regarding the results achieved here. Direct purchaser cases in general, usually settle for two and a half more than two and a half times more than indirect purchaser actions. Here the indirect purchaser class. We're covered double what the direct purchaser class did. We had an expert Josh Davis put in a declaration, which attributed to some. Which discussed some academic research. She'd done about classification outcomes in 100 class actions. And just two cases was a class certified after an initial denial, which is something that happens here. He also testified that two thirds of antitrust class actions have final approval within five years. Here there was nine years before final approval with much higher costs than anticipated or seen in other antitrust class actions. Normally they're between one, 2% of total recovery here. They were 2.5%. Council. Your time is just about up. Can I ask a question, please? Did the district court rely on the grid? Yes, Your Honor. The district court extensively looked at the grid. I didn't ask that. Hold it, hold it. I didn't ask that. Forgive me, but my question is whether he relied on it. He clearly started with it. My question is whether he relied on the grid. Your Honor, I believe the answer is yes. There was a robust hearing that we discussed the grid extensively with him. There were objectors that had made the argument it should be marginal versus the flat rate. His order discusses the two alternatives extensively and he came to his finding. Council, so that I can, forgive me for interrupting, but so that I can get you to focus on my, I'm looking at ER 13, one ER 13 note four, where the judge said, while the difference that will result from interpreting the bid as requiring marginal rates is not de minimis, the bid itself would remain only a starting point. The amount awarded by the order is reasonable under all circumstances regardless of the precise calculation of that starting point. The reason I'm asking this question is because your response to earlier questions by my colleagues and your argument strikes me as being really limited to the grid. And I read this, to just be clear, I read the judge's order here as telling us that he used it as a starting point and he did not consider himself bound by the grid. So your response is you think he did rely on the grid? Your Honor, I think that the judge tried to follow your guidance as best he could, which was to look at the totality of circumstances. He understood your instruction to be that the grid was the starting place. It's our belief that he looked at the grid using the flat rate to calculate the starting point and then looked at the totality of the factors. But I think in this footnote, he's indicating that he considered the award to be reasonable under all circumstances using his discretion, regardless of which starting point was used, either the marginal or the flat rate. Okay. And so that's the way I read this too, and I'm not trying to be coy about it, that it seems to me that that's what he's saying. But Judge Bea is raising a different point, which is per the grid, I think if I can, I don't want to speak for Judge Bea, but there's certainly an argument to be made, Mr. Irwin made it, that the starting point under the grid could have called for no fees to be awarded for the first $5 million on each of those respective settlements. And if we decide that that's the correct reading of the, or would have been the correct application of the grid, what would we do with that? Your Honors, certainly you could remand it back down to Judge Seaborg to consider further. It would be our position though, that this court's jurisprudence over decades in class actions has been that courts must consider the totality of the circumstances. And Judge Seaborg has tried to do that here. I think as indicated by the footnote that you're pointing to saying, regardless of which starting point, the higher one under the flat rates, the lower one under marginal, he's done his best to come to a fee award that takes everything into account, which he believes is fair. Okay. So first time around, of course the chart varies, but the bulk of this award sort of seemed to fall into the 12 or 13% range of these awards, I should say, the settlements. And the three prior approvals, settlements that were approved were within, you know, much closer to the original benchmark, the traditional benchmark of 25%, 23.5% sort of in that range. I thought I calculated earlier that where Judge Seaborg wound up on remand was 15% of the overall recovery of the 205 million. I think the number you gave was 14, but at any rate, do I have that right when you, when you, you're just taking a step back from me and saying that you think that he was reasonable under the circumstances. Am I right that you were at about 24, 25% earlier and you're now at you, you, you, you just mentioned 14% I'd calculated 15%. Do I have that right? Your Honor, you do. And where I'm getting the 14% is that an award was made to Mr. Clore's law firm out of our attorney's fees award. And we had put that into the supplemental excerpts of record one point something million, if I'm recalling correctly. And that when you calculate that in decreases the award to 14%. Okay. One final question and thank you for your patience with my questions. There was one little settlement. These numbers are so big that to say little seems a little out of place, but there's one $5 million settlement. And I think there was no request for fees made on that at all. Is that right? That's correct, Your Honor. And if my memory is correct, that was the NEC settlement and there was no request for fees given how it fell on the bread. Okay. So if you look at the grid, this will be your last question. If you look at the grid, then that $5 million would have not entitled you to the fees, regardless of the stage of the litigation, because the grid has a 0% at $5 million all the way across the board. But I think the way you've applied. That's right. Okay. So I think what your application on remand is for. As to the other defendants, you have started with the left-hand column, right? And you did this on a defendant-by-defendant basis, not by defendant-family. Is that right? No, Your Honor. I think it would be defendant-family. The defendant-family is operated as one defendant in this case. Okay. So the $124.5, that family, then it would be 1, 2, 3, 4, 5. The sixth box down is where you started. Is that right? So, Your Honor, then I think we're miscommunicating. So there's three rounds of settlements. Yes. But those group together defendant-families. And so NEC, for example, is one defendant. I understand. I get that part. I wrote the opinion. I understand that. But I don't know that you're answering my question about how you applied it on remand. If you could cut to that, Chase, please. So every settlement would have had a dollar value that takes into account the stage of the case and the amount per that defendant. So the Toshiba defendant-family or the NEC defendant-family. We would have gone down the grid for that number and applied. So a $25 million settlement, for example, reached from pleading through motion to dismiss, which would be the first column, we would have applied a 5% fee award. That's how it was intended to be applied and how we applied it to come to our numbers. Okay. So our published opinion made note that there had been some inconsistency about the way Higgins-Berman applied this grid earlier on in the litigation. And then at page, I think it's 9, but at any rate, the published opinion says the firm seems to have treated each of the four settlements comprising the first round recovery as separate awards rather than inputting the lump sum. Remember that sentence? Yes, Your Honor. Rather than inputting the component parts. And then we wrote, the text above the grid on the single unsealed page of the firm's proposal permits this approach. And then we went on to say, and I think pretty clearly took exception to, that the firm had applied the grid differently on other occasions. So I think what you're telling me is that on remand, you've calculated this way where the component parts are separately plugged in pursuant to this left-hand column. Is that right? Yes, Your Honor. Thank you. That's the end of my questions. Thank you. Okay. Thank you very much. My time is up, but we think that the court and Judge Seaborg fairly construed the award within his abuse of discretion. Thank you all very much for your time today. Okay. Thank you, Ms. Scarlett. Mr. Clark. Thank you again. Judge Bay was correct. The bid was submitted on a sliding scale marginal rate basis on its express terms because it explicitly relied on the Wonderhold opinion in which a marginal rate bid was awarded by Judge Walker. And they explicitly, that was the only ruling they cited, and that ruling did, or that case did accept a bid on marginal rates, not flat rates. And the difference is the bid would have been, as Judge Bay, you pointed out, $22.1 million, and a 20% of premium applied to that would be approximately $26 million. But even if they hadn't, even if there wasn't that explicit language, and even if it were ambiguous, it's our position that any ambiguity should inure to the benefit of the class and not class counsel. So the district court, some of the factors that my colleague on the other side referenced were factors that they argued were uncontemplated at the time of the bid. They weren't factors that the court articulated as uncontemplated. Quite the contrary, most of those factors that she named were circumstances which the judge felt would have been contemplated at the time or, at the very least, should have been contemplated. At the end of the day, essentially what it boiled down to in terms of uncontemplated factors from the judge's perspective was, number one, long and hard fought litigation, which, you know, we just don't think there's any way you can say that that was uncontemplated considering the other firms who, the groups of firms that bid anticipated far more in litigation expenses. And then just the sheer size and nature of the litigation was, it was bound to be a long task, an arduous task. And then otherwise, the district court concluded that the fee, a 20% premium, which in fact is a 40% premium, was justified based on the cumulative effect of the factors without defining what that means and without . . . So, as it stands, from our perspective, there's nothing for this court to review in terms of the adjustment upward. The waiver arguments are red herrings. We did not . . . This is going back to the violations of the rules of ethics. We did not challenge the quick pay provision. We're not challenging the quick pay provision. We're challenging what happened with the funds after they were distributed to Huggins Berman. We're also not challenging the terms of the payback provision. The payback provision doesn't say you get to keep vacated attorney's fees. Otherwise, they don't believe . . . Apparently, they don't believe that the rules of ethics apply when you have . . . when Rule 23A governs the adequacy of class counsel. We believe it's important for this court to explain that they're wrong on that point. If this court doesn't, then I think it's going to be the standard going forward that if a case is vacated, the attorneys are going to keep those fees and they have no obligations to comply with the California rules of professional conduct and place the funds in client trusts. The State Bar of California didn't see fit to provide a class action exception for the safekeeping rules. We don't believe this court should either. We would respectfully request that the court find the violations of the rules of ethics as set forth in the brief and enter an appropriate forfeiture. Alternatively, we would request that the court remand for the district court to consider a forfeiture. Then, at a bare minimum, we would ask that the fees be limited to the $22.1 million bid, unless there are any other questions. I have a question, Mr. Clark. Assuming, for sake of argument for a minute, that the panel is not inclined to remand to consider a forfeiture, but was inclined to think the fees were overstated in some amount, does our panel have the authority under class action law, do we have the authority to just set the figure that we think would be the correct figure or do we have to set out a framework and remand to the district court? I believe the court has the authority to enter a forfeiture based on, we cited a few cases where that has happened and there's a Pionville opinion. The premise is if we are not inclined to order a forfeiture. If you're not inclined to order a forfeiture. I think that's the premise. I think you may have missed the premise of Judge Gould's question. That was my premise. If the court is not inclined to order a forfeiture. But if we thought the fees should be reduced in some amount. Yes. Do we have authority to do that or do we just have to remand? Yes, Your Honor, I believe so. Assuming that the class was entitled to some amount of interest on the $52.8 million before the new award was made, how would we calculate that amount of interest? The interest would be calculated from the entry of each awards based on some interest rate until the date of vacature. I think we calculated that in our brief in a footnote. I'm sorry, I don't have the numbers in my head right now. But I think it's around 600 and something thousand. Okay, thank you. Thank you. Thank you. And we're adjourned until public hearings close. Thank you, Your Honor. Challenging case. Now, before we conclude, I want to say if John Steitler of our IT department is listening, I want to thank you for getting us back on track. And then I want to again thank the advocates here, Mr. Kluwer, Ms. Scarlett, for both for their excellent advocacy, which we really appreciate, and also for their patience in putting up with our technical problems until we could solve them. So without further comment, unless Judge Kristin or Judge Bayh have a question, we will submit this case, indirect purchaser class versus Samsung Electronics, and the parties will hear from us in due course on the fees issue. Thank you. All rise. This court for this session stands adjourned. Thank you, Sam.
judges: GOULD, BEA, CHRISTEN